In re the Marriage of Daniel E. **HEMMINGSEN, petitioner, Appellant,**

v.

Claudia J. **HEMMINGSEN, Respondent.**

No. A08–1136.

Court of Appeals of Minnesota.

July 7, 2009.

Bruce K. Piotrowski, George F. Restovich & Associates, Rochester, MN, for appellant.

Steven C. Youngquist, Youngquist Law Office, Rochester, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; SCHELLHAS, Judge; and WILLIS, Judge.*

## OPINION

SCHELLHAS, Judge.

Appellant argues that the district court abused its discretion by (1) denying his motion to terminate his spousal-maintenance obligation, (2) denying his motion for amended findings, and (3) granting respondent need-based and conduct-based attorney fees. Because the district court did not make adequate findings to support its order regarding modification of spousal maintenance and attorney fees, we remand for additional findings. We therefore do not address the district court's denial of appellant's motion for amended findings.

## FACTS

In 1966 appellant Daniel E. Hemmingsen and respondent Claudia J. Hemmingsen were married. They divorced in 1998, pursuant to a marital-termination agreement (MTA) that was incorporated in their dissolution judgment. In the MTA, the parties agreed that: (1) appellant, a realtor, had average annual taxable income from 1995 through 1997 of $45,723; (2) appellant's monthly budget was $2,330; (3) respondent's average annual gross income from 1995 through 1997 was $11,600; and (4) respondent's monthly budget was $2,235. The parties did not stipulate to retirement age. Under the dissolution judgment, appellant must pay $1,000 per month in maintenance to respondent "until terminated" and "maintenance payments shall terminate when [respondent] dies or remarries, whichever event occurs first."

In 1999 appellant married realtor Becky Amato. They initially kept their businesses separate but began to work as a real-estate team as the real-estate market slowed down. Later, according to appellant, "[a]s the market continued to decline and in a further effort to keep [their] expenses down and stay in business," appellant "went to work as [Amato's] real estate assistant."

In July 2005 appellant moved the district court to modify or terminate maintenance. Having reached age 62, appellant claimed that he had retired but acknowledged that he continued to work as Amato's assistant for payment of $1,000 per month. Respondent

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

challenged the genuineness of appellant's retirement and income reduction, noting that he had increased his monthly living expenses before his purported retirement. The district court denied appellant's motion and awarded respondent $500 in attorney fees without indicating whether they were need-based, conduct-based, or both. The district court found "unpersuasive [appellant's] assertion that he has 'retired' as a realtor and, as a consequence ... experienced a substantial change in financial circumstances that would warrant being relieved of the permanent maintenance obligation." The court also found that appellant "self-limited his income in an effort to avoid his on-going spousal maintenance obligation and has attempted to cleverly understate his income," and that "there is nothing in the record to reflect that [appellant] suffers from any physical or emotional difficulties that would prevent him from continuing to maintain an active real estate practice despite the fact that he has recently turned 62 1/2 years old."

In October 2007 appellant moved the district court to terminate maintenance, effective July 10, 2007, the date on which he turned 65. He claims that his income continued to decline following his 2005 motion to modify maintenance. Based on the record before the district court, in 2005 appellant and Amato reported joint net business income of $70,886, of which appellant attributed one-half to himself. In 2006 appellant and Amato joined a new real-estate company and separated their businesses. In 2006 appellant's gross business income was $35,964, Amato's gross business income was $102,172, and appellant and Amato reported joint net business income of $47,767. Appellant claims that from January to July 2007, he received less than $5,000 in real-estate commissions and that "due to the depressed market," he fully retired from real estate on his 65th birthday. Appellant did not allege that he was subject to mandatory retirement as a realtor.

The day after his 65th birthday, appellant accepted a part-time independent contractor position with Wind Energy Developers, Inc., where appellant earns $25 per hour, receives a $70 bonus for each wind-option agreement he procures, and reimbursement of his expenses. Appellant informed the district court that from July 11, 2007 until September 27, 2007, he earned just over $5,000. He did not provide a breakdown of the $5,000 between hourly wages and bonuses, and he has not provided an estimate of his anticipated annual earnings as a part-time independent contractor. Appellant explains that he and Amato have supplemented their income by withdrawing $20,000 in 2006 and $7,500 in 2007 from appellant's IRA, leaving it depleted. He claims that his living expenses have increased, necessitating that he and Amato obtain a home-equity loan to cover their monthly expenses of $5,046, which he does not apportion between them.

In opposing appellant's motion to terminate maintenance, respondent argued that appellant chose to retire from real estate early to reduce his income; that he has gross income of $40,024, combining his social security with his earned income from his part-time independent-contractor work; and that any reduction in income does not constitute a substantial change in circumstances from the income he earned at the time of the dissolution. Respondent detailed her own expenses and argued that they exceed her spousal maintenance combined with her own resources. Respondent sought attorney fees from appellant, based on need and appellant's conduct. Appellant responded by disputing that he chose to retire early; he stated, "I did not

retire early; I changed jobs into a new field, even at the age of 65. Many real estate agents are getting out of the business, as are home builders, lenders, and all facets of people related to the housing market."

The district court denied appellant's motion, finding that appellant: (1) retired from the real-estate business on his 65th birthday; (2) received $1,184.50 per month in social-security payments after paying a $93.50 Medicare premium; (3) worked as an independent contractor and his "actual income from this business cannot yet be established with any certainty"; and (4) claimed that "his retirement was prompted by a downturn in the real estate market, but is unable to meaningfully corroborate that claim." The court also determined appellant's share of reasonable monthly expenses to be approximately $2,400 and found that appellant has "the reasonable ability to continue to pay the spousal maintenance he agreed to pay in the marital termination agreement." The court awarded respondent need-based attorney fees in the amount of $500. In its conclusions of law, the court noted that "[i]f the obligee raises a colorable claim of bad faith, an obligor must show by a preponderance of the evidence that the change of circumstances was not primarily influenced by a specific intent to decrease or terminate maintenance" and stated that "[appellant] has failed to meet his burden of proof."

Appellant moved for amended findings, and respondent sought additional attorney fees. The district court denied appellant's motion and granted respondent an additional $1,000 in need-based attorney fees. This appeal follows.

## ISSUES

I. Did the district court err by considering respondent's claim that appellant retired in bad faith at age 65?

II. Did the district court clearly err by finding that respondent raised a colorable claim of bad-faith retirement and that appellant failed to show that his retirement was not primarily influenced by a specific intent to decrease or terminate maintenance?

III. Did the district court abuse its discretion in granting respondent attorney fees?

## ANALYSIS

### I.

■ Modification of maintenance is reviewed for an abuse of discretion. *Hecker v. Hecker,* 568 N.W.2d 705, 710 (Minn. 1997); *see also Claybaugh v. Claybaugh,* 312 N.W.2d 447, 449 (Minn.1981) ("Although the trial court is vested with broad discretion to determine the propriety of a modification, we have suggested that trial courts exercise that discretion carefully and only reluctantly alter the terms of a stipulation governing maintenance."). A district court abuses its discretion when it makes findings unsupported by the evidence or when it improperly applies the law. *Dobrin v. Dobrin,* 569 N.W.2d 199, 202 & n. 3 (Minn.1997). "Findings of fact concerning spousal maintenance must be upheld unless they are clearly erroneous." *Gessner v. Gessner,* 487 N.W.2d 921, 923 (Minn.App.1992). Findings of fact are clearly erroneous when they are "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Tonka Tours, Inc. v. Chadima,* 372 N.W.2d 723, 726 (Minn. 1985).

■ "A party moving to modify an award of maintenance bears the burden of showing a substantial change of circumstances since the last time maintenance

was modified or, if maintenance has not been modified, since it was originally set." *Youker v. Youker,* 661 N.W.2d 266, 269 (Minn.App.2003), *review denied* (Minn. Aug. 5, 2003). After showing changed circumstances, the moving party must demonstrate that the change renders the original award unreasonable and unfair. *Hecker,* 568 N.W.2d at 709. Changed circumstances include substantially increased or decreased income or expenses of either party. Minn.Stat. § 518A.39, subd. 2(a) (2008).

■■■ "Where an obligor voluntarily creates a change of circumstances, the trial court should consider the obligor's motives." *In re Richards,* 472 N.W.2d 162, 164–65 (Minn.App.1991). "If the change was made in good faith, then the obligee should share in the hardship as if the parties had remained together." *Id.* at 165 (citing *Giesner v. Giesner,* 319 N.W.2d 718, 720 (Minn.1982)). "[W]hen an obligee raises a colorable claim of bad faith, an obligor must show by a preponderance of the evidence that a decision to retire early was not primarily influenced by a specific intent to decrease or terminate maintenance...." *Id.*

> In determining this issue, the trial court should consider the obligor's health and employment history, the availability of and expectations regarding early retirement at the time of the divorce, and the prevailing managerial policies and economic conditions at the time of retirement, together with whatever subjective reasons the obligor may offer.

*Id.* at 165. In *Richards,* this court did not establish a rule that *every* obligor retiring early bears a burden of showing that the decision to retire was not primarily influ-

enced by a specific intent to decrease or terminate maintenance; rather, *Richards* established a rule that imposes such a burden only "when an obligee raises a colorable claim of bad faith."

■■■ Appellant argues that when an obligor retires at a normal or customary retirement age, his retirement should be presumed to be in good faith, as a matter of law, "regardless of actual motivation," and that appellant's retirement at age 65 should preclude a finding of bad faith. We disagree. We conclude that when an obligor seeks to modify or terminate maintenance and the obligee raises a colorable claim of bad faith, the burden-shifting analysis applied to early retirement in *Richards* also applies to a change in circumstances in the form of voluntary retirement at a normal or customary retirement age. In applying this analysis, the district court should consider the *Richards* factors. That an obligor retires at a normal or customary retirement age weighs strongly in favor of a finding of good faith but is not conclusive of good faith.

■■■ Our decision here is in accord with decisions from other jurisdictions. The Colorado Court of Appeals stated that "[t]he majority rule appears to be that reduced income due to a spouse's objectively reasonable decision to retire, made in good faith and not with the intention of depriving the other spouse of support, should be recognized as a basis for modifying maintenance." [1] *In re Swing,* 194 P.3d 498, 501 (Colo.Ct.App.2008). And we find persuasive decisions from other jurisdictions concluding that age 65 is generally considered a normal or customary retirement age and that age of retirement is

---

1. Of course, under Minnesota law a party seeking modification or termination of maintenance must show the existence of substantially changed circumstances *and* that the changed circumstances render the award unreasonable or unfair. *Youker,* 661 N.W.2d at 269.

relevant in considering whether retirement will amount to changed circumstances for purposes of modifying or terminating maintenance. *See Pimm v. Pimm,* 601 So.2d 534, 537 (Fla.1992) (discussing retirement age); *Bickel v. Bickel,* 95 S.W.3d 925, 929 (Ky.Ct.App.2002) (concluding age was relevant but there was no age at which retirement was objectively reasonable per se). But consistent with decisions in other jurisdictions, we conclude that an obligor should not "merely utter the word 'retirement' and expect an automatic finding of a substantial and material change in circumstances" and that retirement should not provide the requisite changed circumstances when it was "primarily motivated by a desire to . . . reduce the alimony paid to the former spouse." *Bogan v. Bogan,* 60 S.W.3d 721, 729 (Tenn.2001).

Appellant's argument that this court should determine that a presumption of good faith exists when an obligor retires at an ordinary or customary retirement age is misplaced. Although the policy argument has merit, "the task of extending existing law falls to the supreme court or the legislature, not to this court." *Tereault v. Palmer,* 413 N.W.2d 283, 286 (Minn.App.1987), *review denied* (Minn. Dec. 18, 1987); *see also Goldman v. Greenwood,* 748 N.W.2d 279, 285 (Minn.2008) (stating that endangerment for purposes of Minn.Stat. § 518.18(d)(iv) considers a child's present environment and although policy argument in favor of considering a child's future environment had merit, "such a determination belongs to the legislature, not to this court"). Therefore, even though appellant retired from the real-estate business at age 65, if respondent, as obligee, raised a colorable claim that appellant, as obligor, retired in bad faith, the *Richards* burden-shifting analysis applies to appellant's motion to terminate maintenance.

## II.

Appellant argues that the district court clearly erred in finding that respondent made a colorable claim of bad faith that appellant failed to rebut and clearly erred in finding that appellant had the continued ability to pay maintenance.

Effective appellate review of an award of maintenance "is possible only when the trial court has issued sufficiently detailed findings of fact to demonstrate its consideration of all factors relevant to an award." *Stich v. Stich,* 435 N.W.2d 52, 53 (Minn.1989); *see also Dougherty v. Dougherty,* 443 N.W.2d 193, 195 (Minn.App.1989) (applying *Stich* to modification decision). Findings are necessary "to facilitate meaningful appellate review, to show that the trial court considered all the relevant statutory factors, and to satisfy the parties that the trial court fairly resolved their case." *Lewis v. Lewis,* 414 N.W.2d 588, 590 (Minn.App.1987). "Taking into account the broad discretion of the trial court on issues in marital cases, 'it is especially important that the basis for the court's decision be set forth with a high degree of particularity if appellate court review is to be meaningful.'" *Id.* (quoting *Wallin v. Wallin,* 290 Minn. 261, 267, 187 N.W.2d 627, 631 (1971)). Remand for additional findings is appropriate when the district court fails to make adequate findings. *Tuthill v. Tuthill,* 399 N.W.2d 230, 232 (Minn.App.1987).

Here, because the district court cited the *Richards* burden-shifting analysis and stated that appellant failed to meet his burden under that analysis, the district court apparently found or assumed, albeit implicitly, that respondent raised a colorable claim of bad faith. But the district court made no findings to assist us in conducting a meaningful review of why it found that respondent raised a colorable

claim of bad faith and that appellant failed to meet the burden shifted to him under *Richards.*

The district court explicitly found that appellant has the ability to pay maintenance, but made no findings to explain why. *See Erlandson v. Erlandson,* 318 N.W.2d 36, 40 (Minn.1982) (concluding that an obligor was able to pay support because his income was "adequate to provide him with the ability to meet his needs while providing the ordered spousal maintenance"). The district court found that the "total *joint* income" of appellant and his wife was $80,640 and $79,516 for 2005 and 2006, but did not address the fact that appellant reported his business income separately from Amato in 2006 and supplemented his income with an IRA withdrawal of $20,000. (Emphasis added.)

A moving party must establish changed circumstances and then establish that the changed circumstances make the award of maintenance unreasonable or unfair. *Youker,* 661 N.W.2d at 269. When a district court rejects the changed circumstances relied on by a moving party as created in bad faith, there is no need to address whether the award is unreasonable or unfair. *See Tuthill,* 399 N.W.2d at 232 (stating that where moving party fails to establish a change in circumstance modification is precluded and the district court need not make findings on other factors addressed in the modification statute).

Here, although the district court rejected the changed circumstances relied on by appellant, it addressed the issue of appellant's ability to pay maintenance by determining that appellant has the current ability to pay maintenance. But the district court did not explain the basis on which it determined appellant's current ability to pay maintenance—the court found only that appellant's present income could not yet be determined.

We recognize the difficulty of the district court's task in determining appellant's income, past and present, based upon the income evidence submitted by appellant. For example, appellant claimed in 2005 that he worked as an assistant to his current wife, Amato, earning $1,000 per month, but appellant apparently abandoned this position sometime after his 2005 motion was denied. Appellant's presentation of income evidence, including his tax returns, has been unpersuasive to the district court, dating back to his motion to modify or terminate maintenance in 2005.

But a district court has options for assessing income for purposes of maintenance when actual income cannot be determined. In appropriate circumstances, a district court may estimate an obligor's income. *See LeRoy v. LeRoy,* 600 N.W.2d 729, 733 (Minn.App.1999) ("A district court may consider past earnings and earning capacity to estimate an obligor's future income."), *review denied* (Minn. Dec. 14, 1999); *see also Fulmer v. Fulmer,* 594 N.W.2d 210, 213 (Minn.App.1999) ("Trial courts may use earning capacity to measure income if it is either impracticable to determine an obligor's actual income or the obligor's income is unjustifiably self-limited."); *Ferguson v. Ferguson,* 357 N.W.2d 104, 108 (Minn.App.1984) (stating that "the opportunity for a self-employed person to support himself yet report a negligible net income is too well known to require exposition"). A district court may also impute income to an obligor when it finds the obligor has acted in bad faith in limiting the obligor's income. *Melius v. Melius,* 765 N.W.2d 411, 416–17 (Minn. App.2009). And as noted above, a district court may simply determine that an obligor had not met the burden of showing a substantial change in circumstances. *Youker,* 661 N.W.2d at 269 (stating that moving party has the burden of showing

changed circumstances); *see also Eisenschenk v. Eisenschenk,* 668 N.W.2d 235, 243 (Minn.App.2003) (stating that a party cannot complain on appeal about an unfavorable ruling when the party failed to provide the district court with evidence necessary to address the question presented), *review denied* (Minn. Nov. 25, 2003). In this case, because the district court did not make findings detailing its approach, we cannot determine how the district court determined that appellant has the ability to pay maintenance.

We conclude that the district court's findings regarding appellant's bad faith are inadequate and fail to support the district court's ruling. We therefore remand for additional findings. On remand, if the district court makes adequate findings to support its ruling that appellant created changed circumstances in bad faith, the court need not address appellant's ability to pay. But if the district court determines that appellant has shown that his changed circumstances, i.e., his retirement, were not primarily influenced by a specific intent to decrease or terminate maintenance, the court must make adequate findings to support a determination that appellant has the ability to pay maintenance.

## III.

 Appellant argues that the district court abused its discretion in awarding respondent attorney fees. A district court may award attorney fees based on the need or conduct of a party. Minn.Stat. § 518.14, subd. 1 (2008). Need-based fees shall be awarded if the district court finds that the fees are necessary for the good-faith assertion of a party's rights, that the party from whom the fees are sought has the means to pay them, and that the party to whom they are awarded does not have the means to pay them. *Id.* In both orders awarding fees, the district court found that respondent needed the fees to assert her rights and that appellant has the means to pay the fees. We conclude that the findings about appellant's means to pay the attorney fees are inadequate because we cannot determine how the district court assessed appellant's means. We therefore remand for additional findings.

## DECISION

If an obligee raises a colorable claim of bad faith on the part of an obligor who voluntarily retires at a normal or customary retirement age, the obligor must show by a preponderance of the evidence that the change in circumstances was not primarily influenced by a specific intent to decrease or terminate maintenance. Retirement that occurs at a normal or customary retirement age weighs strongly in favor of a finding of good-faith retirement but is not conclusive of good faith. The district court's findings that respondent raised a colorable claim of bad faith, that appellant failed to rebut the claim, that appellant has the ability to pay maintenance, and that appellant has the means to pay attorney fees to respondent are not adequate for meaningful review. We remand for additional findings. The district court has discretion to receive additional evidence.

**Remanded.**

ROSS, Judge (concurring in part, dissenting in part).

I respectfully dissent from the court's primary holding. The majority would require all retiring spousal maintenance obligors to disprove a suspicion that we know does not exist. Why would a spousal maintenance obligor's decision to retire at a customary retirement age require him to disprove that the decision is in bad faith when the decision "weighs strongly in fa-

vor of a finding of good faith"? I think the majority's holding today mistakenly extends precedent.

I agree with the majority that a spousal maintenance obligor's retirement "at a normal or customary retirement age weighs strongly in favor of a finding of good-faith retirement." *Supra* at 720. And I agree that "when an obligor retires at an ordinary or customary retirement age" a policy presuming good faith in the retirement decision "has merit." *Supra* at 718. I think these are undeniable principles that underlie spousal maintenance caselaw. I therefore disagree that we should plot a different course to require obligors who retire in the normal timing of things to justify their ordinary retirement decision in the same way that precedent requires *early* retiring obligors to disprove bad faith.

The court today remands with instructions to require Daniel Hemmingsen to prove he retired in good faith if Claudia Hemmingsen is deemed to have presented a "colorable claim" of bad faith. But in my view, Mr. Hemmingsen's age itself is a sufficient response to Ms. Hemmingsen's accusation about his motive, and it should be her burden to prove bad faith to reply to the compelling fact that retirement occurred in the ordinary timing of things. As it stands, the court's holding today may be construed as requiring district courts to presume bad faith when a spousal maintenance obligor retires at a customary retirement age merely upon some superficial "colorable" accusation.

Although our caselaw imposes on the *early* retiring obligor a burden to disprove bad faith, it has never demanded or implied that a similar burden follows the ordinarily retiring obligor. In *Giesner v. Giesner*, 319 N.W.2d 718, 719–20 (Minn. 1982), the district court refused to reduce an out-of-work obligor's spousal mainte-

nance obligation when the obligor voluntarily depleted his assets by trying to start a business after losing his job. The supreme court remanded the case and required the district court to consider the obligor's subjective motive for the decision, reasoning that an income-restricting employment decision should not prevent a reduction in his maintenance obligation unless he made the decision with the intent to undercut his obligation by rendering himself unable to pay. *Id.*

In *In re Marriage of Richards*, we extended *Giesner* to an obligor's voluntary decision to retire early. 472 N.W.2d 162, 165 (Minn.App.1991). We held that when a spousal maintenance obligee raises a "colorable claim" that retirement is the result of bad faith, "an obligor must show by a preponderance of the evidence that a decision to retire *early* was not primarily influenced by a specific intent to decrease or terminate maintenance." *Id.* (emphasis added). We did not expressly explain what constitutes a "colorable claim," but one must infer from our reasoning in *Richards* that accusing an obligor of seeking a maintenance reduction after retiring early, without more, constitutes a "colorable claim" of bad faith. Our holding clarified that the early retiring maintenance obligor who faces a claim of bad faith consequently has the burden to disprove that his retirement was intended to eliminate his obligation. So once the claim of bad faith is made in the context of early retirement, an implied presumption of bad faith exists and a finding of changed circumstances requires the obligor to disprove bad faith. *Id.*

But I see no basis to extend the *Richards* bad-faith presumption in early retirement cases to ordinary retirement cases. Unlike in *Richards*, where "we perceive[d] no reason why *Giesner* should not apply" to *early* retirement, *id.*, there is an obvious

reason not to treat the ordinarily retiring obligor in the same fashion as the early retiring obligor. Ordinary retirement is an expected event in the life of a worker. Early retirement is not. So early retirement is suspicious, and ordinary retirement is not. We expect divorced workers to follow the same personal economic incentives that motivated them during the marriage, and when they do not, we recognize that they must be moved by some other incentive. In the case of the early retiring spousal maintenance obligor, one strongly suspects that the other incentive is to avoid paying maintenance, and *Richards* directs district courts to respond by loading the obligor with the burden to overcome the suspicion. That the *Richards* court used the term "early retirement" rather than merely "retirement" demonstrates that we recognized *early* retirement as an unusual class of retirements warranting special scrutiny. But because retirement at an ordinary age carries no similar inherent suspicion, we have no basis to treat ordinarily retiring obligors the same way.

The majority seems to agree that the distinction between early and ordinary retirement is significant, but it indicates that without policy-driven legislation we are compelled to extend *Richards* to ordinary retirement cases. I do not agree. In the 27 years since *Giesner* and the 18 years since *Richards*, no Minnesota court has held that the obligor who retires on an expected schedule carries the burden to overcome a presumption of bad faith. I believe that by extending *Richards*, we upset the current approach, which appears to be to treat proof of retirement at the customary age as prima facie evidence of good faith.

I would expressly hold that retirement at the customary age is prima facie evidence that the retirement occurred in good faith. This seems implicit in the 27–year silence in our caselaw and explicit in at least one unpublished opinion, which I find persuasive. *See Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn.App. 1993) (recognizing that unpublished decisions may be referred to for their persuasive quality). In what appears to be the only case on point, we reasoned that proof that an obligor's retirement occurred at a customary retirement age can alone establish that the retirement occurred in good faith. In *Buscher v. Buscher*, we reasoned that an ailing spousal maintenance obligor's retirement at age 68 alone established that the retirement occurred in good faith. No. CX–02–130, 2002 WL 1751087, at *3 (Minn.App. July 30, 2002), *review denied* (Minn. Oct. 15, 2002). It is true that in *Buscher* we considered the obligor's health difficulties as factors worthy of consideration among others that were discussed in *Richards*. But we did not require the obligor to introduce any evidence other than his age or to offer more argument. Instead, we declared the analysis of the obligor's health to be unnecessary: "Even without his health problems, however, *appellant's age alone* supports good-faith retirement." *Id.* (emphasis added).

I would hold again in this published opinion that retirement at the customary "age alone" establishes that the retirement occurred in good faith with no additional showing necessary. Whether we treat that proof of customary retirement as the obligor's response to a "colorable claim" of bad faith, or we treat customary retirement as a fact that "weighs strongly in favor of a finding of good faith," the practical result is the same: once we know that the obligor's retirement occurred during the customary period, the burden then falls to the obligee to overcome the appearance of validity.

In other words, applying the majority's unassailable premise that a spousal maintenance obligor's decision to retire at a customary retirement age "weighs strongly in favor of a finding of good faith," I would hold that Daniel Hemmingsen's ordinary retirement decision is presumptively legitimately motivated. On our facts, even if Claudia Hemmingsen provides some argument or evidence amounting to a "colorable claim" of bad faith, Daniel Hemmingsen should be entitled to a reduction in his spousal maintenance obligation commensurate to the resulting substantial change in circumstances unless Claudia Hemmingsen has introduced evidence sufficient to overcome the presumption of good faith. I concur in the decision to remand because I believe that the district court failed to "ma[k]e ... findings to assist us in conducting a meaningful review of why it found that [Claudia Hemmingsen] raised a colorable claim of bad faith" and why it found that Daniel Hemmingsen's presumptively good-faith decision to retire at age 65 was actually motivated by bad faith.